

Oxford
Immunotec

V.

Qiagen Inc., *et. al*

Case No. 15-13124

# Oxford's Technology Tutorial
### *June 8, 2017*

**PROSKAUER ROSE LLP**

Steven M. Bauer

Siegmund Y. Gutman

Thomas C. Chen

# The Asserted Patents

## "TUBERCULOSIS DIAGNOSTIC TEST"



**7,632,646**
Filed: Nov. 3, 1999
Issued: Dec. 15, 2009

7,901,898
Filed: Oct. 14, 2009
Issued: Mar. 8, 2011

8,216,795
Filed: Jan. 25, 2011
Issued: Jul. 10, 2012

8,507,211
Filed: Jun. 6, 2012
Issued: Aug. 13, 2013

9,005,902
Filed: Jul. 12, 2013
Issued: Apr. 14, 2015

## "ASSAY METHOD FOR PEPTIDE SPECIFIC T-CELLS"



8,617,821
Filed: Jul. 28, 2009
Issued: Dec. 31, 2013

# Tuberculosis Screening and Diagnosis

- Tuberculosis (TB) is an infectious disease caused by the bacterium *Mycobacterium tuberculosis* ("*M. tuberculosis*")

- Approximately 1/3 of the world population may be infected and at risk of developing active  disease (which is often fatal)

- Early and accurate diagnosis is important for effective disease control and treatment



**Tuberculosis (TB) Infections**

# Infection with *M. tuberculosis*:  *In Vivo*



1)  *M. tuberculosis* produces ESAT-6



2)  APC absorbs and digests ESAT-6 into peptides



3)  MHC molecules present peptides at the outer surface of APC



4)  APC encounters T-Cell



5)  MHC:peptide complex binds to T-Cell receptor, and activates T-Cell to release cytokines



6)  Cytokines recruit other immune cells to fight infection



# Epitope Identification Was Routine and Well Known



### Scanning

In principle, scanning for T cell epitopes is simple and only requires that appropriate linear peptides homologous with the whole antigen are added to the APC/T cell mixture, followed by the measurement of a parameter of T cell activation. The added peptides can associate with "empty" MHC molecules on the surface of APC, or may be taken up by endocytosis and associate with newly synthesized or recycled MHC molecules. In either case, a degree of peptide breakdown can occur, giving rise to recognition of a truncated version of the synthetic peptide added. Thus, a response to a peptide *in vitro* indicates that the epitope is contained within the sequence used, but does not of itself define the effective or minimal sequence.

**Van Regenmortel 1996 at 52
(Oxford Ex. X, Dkt No. 154-24)**

### Truncation Analysis

In many cases, scanning only locates epitopes to an approximate area of a sequence. This is the case when long peptides with small overlaps are used. The epitope can then be found more precisely by truncation analysis. Two series of peptides are made, shortening stepwise from one end while holding the other end constant (Figure 4). Again, the epitope can be inferred but should be confirmed by synthesis and testing of the minimal sequence.

*Id.* at 45

# Tuberculin Skin Test ("TST"):  *In Vivo* Skin Test





Purified protein derivative (PPD) skin test for tuberculosis infection

*PPD is injected intradermally (within the skin) in the inner surface of the forearm.*

If the site becomes indurated (hard) after 48 to 72 hours, then the reaction may be positive.

# Oxford's Invention:  *In Vitro* Blood Test



Blood Sample
(contains T-Cells)

T-Cell

T-Cell receptor

The sequences of SEQ ID NOs 1 to 11 are shown be

SEQ ID NO 1:     MTEQQWNFAGIEAAA (ES1)
SEQ ID NO 2:     SAIQGNVTSIHSLLD (ES4)
SEQ ID NO 3:     QKWDATATELNNALQ (ES12)
SEQ ID NO 4:     NNALQNLARTISEAG (ES14)
SEQ ID NO 5:     NLARTISEAGQAMAS (ES15)
SEQ ID NO 6:     WNFAGIEAAASAIQG (ES2)
SEQ ID NO 7:     EGKQSLTKLAAAWGG (ES7)
SEQ ID NO 8:     YQGVQQKWDATATEL (ES11)
SEQ ID NO 9:     NVTSIHSLLDEGKQS (ES5)
SEQ ID NO 10:    IEAAASAIQGNVTSI (ES3)
SEQ ID NO 11:    TATELNNALQNLART (ES513)

Test Tube
(contains Peptides)

T-Cell

T-Cell receptor

Cytokines
(i.e. IFN-γ)

# T-SPOT.TB and QuantiFERON-TB

- Both products measure interferon-gamma (IFN-γ) release by T-Cells in response to synthetic peptides containing the recited SEQ IDs



 v. Qiagen Inc., *et. al*

# Oxford's Claim Construction Presentation
## *June 8, 2017*

# Terms in Dispute

1.  Peptide(s) "Represented By" the Recited SEQ ID NO(s)

2.  Peptide Panel "Comprising One or More Epitopes Contained Within" the Recited SEQ ID NO(s)

3.  Peptide "Panel" / Panel of "Eight" Peptides

4.  "Determining" and/or "Detecting" steps

5.  Indefiniteness

    -   "one or more epitopes contained within"

    -   "peptide subfragment of ESAT-6 that contains a CD8+ epitope"

    -   "an immunogenic amount"

6.  "T Cell" Limitations

7.  Preambles

# Terms in Dispute

1.  **Peptide(s) "Represented By" the Recited SEQ ID NO(s)**

2.  Peptide Panel "Comprising One or More Epitopes Contained Within" the Recited SEQ ID NO(s)

3.  Peptide "Panel"; Panel of "Eight" Peptides

4.  "Determining" and/or "Detecting" steps

5.  Indefiniteness

    -   "one or more epitopes contained within"

    -   "peptide subfragment of ESAT-6 that contains a CD8+ epitope"

    -   "an immunogenic amount"

6.  "T Cell" Limitations

7.  Preambles

# Peptide(s) "Represented By" the Recited SEQ ID NO(s)

| Term | Oxford's Proposal | Defendant's Proposal |
|---|---|---|
| Peptide(s) <u>represented by</u> SEQ ID NO(s) [X]<br><br>('646 and '898 patents only) | Peptides <u>comprising</u> the recited SEQ ID NO(s) | Peptides having the **exact sequence** set forth in SEQ ID NO(s): [X] and that is/are **15 amino acids in length** |

<u>Issue</u>:  Are the claimed peptides limited to peptides having the **exact same 15 amino acid sequence as the recited SEQ ID NO(s)?**

**1**. A method of diagnosing infection in a human host by, or exposure of a human host to, a mycobacterium which expresses ESAT-6, which method comprises the steps of:
   (i) contacting a population of T cells from the host with the <mark>peptide represented by SEQ ID NO: 1;</mark> and
   (ii) determining in vitro whether the T cells of said T cell population show a recognition response to said peptide.

'898 patent, claim 1; *see also* '646 patent

# Prosecution History:
## The Claims Issued Based On PTO's Understanding that "Represented by" Means "Comprising"

the *M. tuberculosis* protein ESAT-6) for diagnostic use in humans. This is the peptide represented by SEQ. ID. NO: 1 in the subject application and the essential peptide specified in claim 1.

However, it is noted that the Examiner interprets the claim language broadly. The recitation of "the peptide represented by SEQ ID NO: 1", does not exclude additional amino acids outside of those specifically set forth in SEQ ID NO: 1. The Examiner views this as comprising or open claim language. The prior art discloses the claimed invention.

July 27, 2004 Office Action; Oxford Ex. R at 5 (Dkt No. 154-18)

PMDX-14

# Specification:
## Allows Peptides > 15 amino acids in length

### Length

The analogue is typically from 8 to 80 amino acids in length, such as 10 to 60 or 12 to 50, preferably 15 to 30 or 20 to 25. Typically the amino acids in the analogue at the equivalent positions to amino acids in the original peptide which contribute to binding the MHC molecule or are responsible for the recognition by the T cell receptor, are the same or are conserved.

*See, e.g.,* '646 Patent at 7:27-34

### Homology

The analogue is typically a peptide. It may have homology with the equivalent original peptide represented by one of SEQ ID NO:1, 2, 3, 4, 5, 6, 7, 8, 9, 10 or 11. A peptide which is homologous to another peptide is typically at least 70% homologous to the peptide, preferably at least 80 or 90% and more preferably at least 95%, 97% or 99% homologous

*See, e.g.,* '646 patent at 6:61-66

**ANALOGUE:  e.g. 30 amino acids in length**



**PEPTIDES:   90% sequence homology with analogue**



<u>>15 amino acids</u>

<u>27 amino acids</u>
(3 deletions)



<u>30 amino acids</u>
(3 substitutions)

# The Claimed Peptide(s) are "Represented By" the Recited SEQ ID NO(s)

## Claim Language:  "represented by"

| Dictionary | Definition |
|---|---|
| **Webster's II New College Dictionary** (Oxford Ex. N, Dkt No. 154-14 at 993) | "to serve as a specimen, example, or instance of" |
| **The American Heritage Dictionary of the English Language** (Oxford Ex. O, Dkt No. 154-15 at 1532) | "to describe or put forward . . . as an embodiment of a specified quality" |
| **The New Shorter Oxford English Dictionary** (Oxford Ex. P, Dkt No. 154-16 at 2552) | "serve as a specimen or example of (a class or kind); exemplify" |

# Defendants' "Disavowal" Arguments Fail

1. Defendants' prosecution history arguments do not rest on inventor disavowals, but rather on Examiner rejections.

   - And, those Examiner rejections were directed to **different claims** addressing different subject matter

2. Defendants' prosecution history arguments mischaracterize Oxford's patentability arguments, which distinguished prior art based on the claimed peptides' **<u>activity</u>**—*not* peptide length

"[P]rosecution history . . . cannot be used to limit the scope of a claim unless the *applicant* took a position before the PTO"

*Schwing GmbH v. Putzmeister Aktiengesellschaft,*
305 F.3d 1318,1324-25 (Fed. Cir. 2002)

Most notably, the Examiner rejected the pending claims covering 90% analogues for lack of written description because "[t]he *only peptide enabled by the claimed invention* under examination in this application, *that Applicants were in possession of at the time of filing is* SEQ ID NOs: 1-11, *not the variants or fragments.*" (Sadasivan Decl., Ex. E at pp. 2, 7 (emphasis added).) The Examiner emphasized that "[t]he claims *are enabled* for methods, kits and compositions using the peptides *having the exact sequence set forth in SEQ ID NOs: 1-11.*" (*Id.* at p. 9 (emphasis added).) Following this rejection, Patentee amended the claims to remove the broader language, limiting the claims to peptides represented by SEQ ID NOs: 1-11. (Sadasivan Decl., Ex. F at p. 2.) A notice of allowance followed. (Sadasivan Decl., Ex. G.)[12]

**Defs. Opening Br. at 10-11 (Dkt No. 155)**

# Examiner Rejection Concerned <u>Different</u> Claims

- The Examiner rejection cited by Defendants concerned then-pending claims reciting very different language:



Jan. 2009 Office Action,
Defendants' Ex. E at 2 (Dkt No. 155-8)

# Examiner Rejection Concerned <u>Different</u> Claims

- Then-pending claims 88-111 recited very different language than the issued claims before the Court:  sequence ≥ <u>90% identical</u> and/or <u>end terminal deletions</u>



88.    (New)  A method of diagnosing infection in a human patient by, or exposure of a human patient to, a mycobacterium that expresses ESAT-6, which method comprises the steps of:

(i)    contacting a population of T cells from the patient with a high sensitivity panel of eight peptides, in which each peptide has a sequence at least <mark>90% identical to one of SEQ ID NOS: 1 to 8</mark> or has an <mark>end terminal deletion</mark> of one of SEQ ID NOS: 1 to 8 such that each of SEQ ID NOS: 1 to 8 is represented in the panel, wherein each peptide in the panel retains the ability to be recognized by T cells of a T cell population which recognize a peptide having a corresponding exact sequence of SEQ ID NOS: 1 to 8, and

(ii)    determining *in vitro* whether T cells of the T cell population show a recognition response to the peptides by detecting IFN-γ secretion from the T cells.

**Sept. 2007 Claim Amendment,
Oxford Reply Ex. 2 at 2 (Dkt No. 161-3)**

# "Represented" Does Not Mean "Exact Sequence"

88.    (New)  A method of diagnosing infection in a human patient by, or exposure of a human patient to, a mycobacterium that expresses ESAT-6, which method comprises the steps of:

(i)    contacting a population of T cells from the patient with a high sensitivity panel of eight peptides, in which each peptide has a sequence at least 90% identical to one of SEQ ID NOS: 1 to 8 or has an end terminal deletion of one of SEQ ID NOS: 1 to 8 such that each of SEQ ID NOS: 1 to 8 is represented in the panel, wherein each peptide in the panel retains the ability to be recognized by T cells of a T cell population which recognize a peptide having a corresponding exact sequence of SEQ ID NOS: 1 to 8, and

(ii)    determining *in vitro* whether T cells of the T cell population show a recognition response to the peptides by detecting IFN-γ secretion from the T cells.

**Sept. 2007 Claim Amendment, Oxford Reply Ex. 2 at 2 (Dkt No. 161-3)**

"Our precedent instructs that different claim terms are presumed to have different meanings."

*Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1382 (Fed. Cir. 2008)

"[P]rosecution history . . . cannot be used to limit the scope of a claim unless the **applicant** took a position before the PTO"

*Schwing GmbH v. Putzmeister Aktiengesellschaft*,
305 F.3d 1318,1324-25 (Fed. Cir. 2002)

Other statements in the prosecution history are in accord. For example, the Examiner rejected the claims including to analogues as not enabled under Section 112 because, for example, "applicants have not provided sufficient guidance to enable one skilled in the art to make and use the claimed polypeptides in manner reasonably correlated with the scope of the claims broadly including any number of deletions, *additions*, substitutions and fragments of any size." (Sadasivan Decl., Ex. H at pp. 5-6.)

**Defendants' Opening Brief at 11 (Dkt No. 155)**

PMDX-22

# Examiner Rejection Concerned <u>Different</u> Claims

- The Examiner rejection cited by Defendants concerned pending claims directed to "<u>analogues</u>"—not the <u>peptide</u> claims now before the Court:



==The specification does not support the broad scope of the claims which encompass all variants/analogues of the peptide== and possibility of changing one or more amino acids to any one of 23 different amino acids because the specification does not disclose the following:  the general tolerance to modification (substitution, insertion, deletion) and extent of such tolerance; specific positions and regions of the sequence(s) which can be predictably modified and which regions are critical; what variants/analogues, if any, can be made which retain the biological activity, claimed activity and immunogenicity of the intact peptides; and the specification provide essentially no guidance as to which of the essentially infinite possible choices is likely to be successful.

==The claimed methods and kits as set forth in claims 32-35, 48-50, 56-59, 63-66 and 77-90 are not enabled for the reasons as set forth above.==

**Aug. 2003 Office Action,
Defendants' Ex. H at 6 (Dkt No. 155-11)**

# Examiner Rejection Concerned <u>Different</u> Claims

Claim 33 (previously presented)  A method as claimed in claim 27 or claim 28 wherein any of said peptides is substituted by a peptide analogue which is ==at least 90% homologous==, to the entire corresponding substituted peptide and which retains the ability to be recognised by T cells of a T cell population which recognise the corresponding substituted peptide.

Claim 34 (previously presented)  A method as claimed in claim 27 or claim 28 wherein any of said peptides is substituted by a peptide analogue which has one or more ==end-terminal deletions== and which retains the ability to be recognised by T cells of a T cell population which recognise the corresponding substituted peptide.

***

Claim 48 (previously presented)  A kit as claimed in claim 44 wherein any of said peptides is substituted by a peptide analogue which is ==at least 90% homologous== to the entire corresponding substituted peptide and which retains the ability to be recognised by T cells of a T cell population which recognise the corresponding substituted peptide.

Claim 49 (previously presented)  A kit as claimed in claim 44 wherein any of said peptides is substituted by a peptide analogue which has one or more ==end-terminal deletions== and which retains the ability to be recognised by T cells of a T cell population which recognise the corresponding substituted peptide.

**May 2003 Amendment, Defs. Ex. M at 3, 4 (Dkt No. 155-16)**

# Examiner Allowed <u>Similar</u> Claims in the Same Office Action

- **Examiner <u>allowed</u> several claims containing nearly identical language:**



**Disposition of Claims**

4)☒ Claim(s) *27-82* is/are pending in the application.

    4a) Of the above claim(s) _____ is/are withdrawn from consideration.

5)☒ Claim(s) *27-31,36-43,53-55,75,76,81 and 82* is/are allowed.

6)☒ Claim(s) *32-35,44-52,56-74 and 77-80* is/are rejected.

7)☐ Claim(s) _____ is/are objected to.

8)☐ Claim(s) _____ are subject to restriction and/or election requirement.

*Aug. 2003 Office Action,*
*Defs. Ex. H at Office Action Summary*
*(Dkt No. 155-11 at 3 of 13)*

# Examiner Allowed Similar Claims in the Same Office Action

Claim 27 (original)  A method of determining infection in a human patient by, or exposure of a human patient to, a mycobacterium which expresses ESAT-6 which method comprises the steps of:

(i)      contacting a population of T cells from the patient with the peptide represented by SEQ ID NO: 1 and, optionally, one or more further peptides selected from the group consisting of the peptides represented by SEQ. ID. NOs. 2 to 11 and

(ii)     determining *in vitro* whether the T cells of said T cell population recognise said peptide(s).

Claim 75 (original)  A method of diagnosing infection in a human patient by, or exposure of a human patient to, a mycobacterium which expresses ESAT-6 which method comprises the steps of:

(i)      contacting a population of T cells from the patient with a panel of peptides represented by SEQ. ID. Nos. 1 to 8, wherein said T cells are freshly isolated *ex vivo* cells from peripheral blood, and

(ii)     determining *in vitro* whether T cells of said T cell population show a recognition response to said peptides by determining IFN-*γ* secretion from the T cells.

**May 2003 Claim Amendment, Defs. Ex. M at 2, 6 (Dkt No. 155-16)**

# When Distinguishing Andersen, Oxford's Identification of Peptide "ES1" as "Essential" Was Not a Disclaimer of Longer Peptides

International Application PCT/DK94/00273 (published as WO 95/01441 on 12th January 1995). It cannot rightly, however, be seen as disclosing the invention now claimed, or rendering it obvious, since it **does not direct the selection of the peptide ES1 (the N-terminal 15 amino acid fragment** of the *M. tuberculosis* protein ESAT-6) for diagnostic use in humans. This is the peptide represented by SEQ. ID. NO: 1 in the subject application and the essential peptide specified in claim 1.

**May 2003 Remarks / Arguments, Defs. Ex. M at 9 (Dkt No. 155-16)**

- The "ES" peptides are exemplary embodiments of the claimed peptides

- Among the "ES" peptides, "ES1" is represented by SEQ ID NO:1

The sequences of SEQ ID NOs 1 to 11 are shown be

| SEQ ID NO 1: | MTEQQWNFAGIEAAA (ES1) |
| SEQ ID NO 2: | SAIQGNVTSIHSLLD (ES4) |
| SEQ ID NO 3: | QKWDATATELNNALQ (ES12) |
| SEQ ID NO 4: | NNALQNLARTISEAG (ES14) |
| SEQ ID NO 5: | NLARTISEAGQAMAS (ES15) |
| SEQ ID NO 6: | WNFAGIEAAASAIQG (ES2) |
| SEQ ID NO 7: | EGKQSLTKLAAAWGG (ES7) |
| SEQ ID NO 8: | YQGVQQKWDATATEL (ES11) |
| SEQ ID NO 9: | NVTSIHSLLDEGKQS (ES5) |
| SEQ ID NO 10: | IEAAASAIQGNVTSI (ES3) |
| SEQ ID NO 11: | TATELNNALQNLART (ES513) |

**'646 patent, 2:40-60**

# Oxford Distinguished Andersen Based on Peptide <u>Activity</u>, Not Length

International Application PCT/DK94/00273 (published as WO 95/01441 on 12th January 1995). It cannot rightly, however, be seen as disclosing the invention now claimed, or rendering it obvious, since it **does not direct the selection of the peptide ES1 (the N-terminal 15 amino acid fragment** of the *M. tuberculosis* protein ESAT-6) **for** <u>diagnostic use in humans.</u> This is the peptide represented by SEQ. ID. NO: 1 in the subject application and the essential peptide specified in claim 1.

Indeed, no prior art document before the Examiner points to use of that peptide for determining *M. tuberculosis* infection in humans. In contrast, it is noted once again that the subject application emphasizes at lines 24 to 25 on page 1 of the description that peptide ES1 alone was found to detect nearly 60% of TB patients tested. As previously emphasized in the Response to the Restriction Requirement, this is comparable with a conventional skin test without the problem of false negatives arising from previous BCG vaccination (see in the description line 1 on page 21 and lines 1 to 3 on page 22). Thus, while it may be considered preferable to combine peptide ES1 with further ESAT-6 epitope-containing fragments to provide a peptide panel enabling even higher percentage detection of TB patients, it is evident that peptide ES1 alone enables a clinically useful and indeed advantageous method for detecting *M. tuberculosis* infection in humans compared to conventional TB diagnosis.

\*\*\*

The Andersen et al. US Patent teaches purification of ESAT-6 from a crude culture filtrate and includes reference to diagnostic use but includes no more than very general speculation about diagnostic use of ESAT-6 fragments. Disclosure of the amino acid sequence of ESAT-6 *per se* is not a disclosure of any particular fragment or fragments for any diagnostic use. Moreover, the only relevant example, Example 6 merely reports skin testing of purified *whole* ESAT-6 in guinea pigs. The specification provides no teaching whatsoever of assistance in selecting T cell epitope-containing peptides for diagnostic use in humans. It certainly does not direct selection of the N-terminal peptide ES1.

**May 2003 Remarks / Arguments, Defs. Ex. M at 9 (Dkt No. 155-16)**

# Oxford Distinguished Andersen Based on Peptide <u>Activity</u>, Not Length

In this connection, <mark>the Examiner is asked to note again the disclosure of Elhay</mark> et al., Infect. Immun. (July 1998) 66 3454-3456 (first cited in the search report for the Paent International Application and discussed in the Response to the Restriction Requirement beginning at the bottom paragraph on page 6). That paper (copy appended for ease of reference) derives from the same research group as the Andersen et al US Patent. It is emphasized again that D7 provides data showing that a peptide from the C-terminal region of ESAT-6, peptide p8, is effective in a skin test in detecting T cells in guinea pigs infected with *M. tuberculosis*. <u>However, in the same studies <mark>peptide p1 (amino acid residues 1-20 of ESAT-6) gave no significant result.</mark></u> <mark>It is simply not possible to extrapolate from any prior art animal studies that any fragment from the N-terminus of ESAT-6 will be a <u>useful diagnostic tool in humans.</u></mark> The Elhay et al. paper was published more than 3 years after WO

**May 2003 Remarks/Arguments,**
**Defs. Ex. M at 9-10 (Dkt No. 155-16)**

# Andersen:  Distinguished Based on Peptide <u>Activity</u>, Not Length

<u>The Present Invention Displays High Sensitivity</u>

Applicants submit that the disclosure of Andersen does not encompass the entire scope and content of the present invention, because Andersen fails to teach all of the limitations of the present invention.  Applicants note that the claims have been amended to recite the use of a "high sensitivity panel of peptides," a characteristic intrinsic to the panel of peptides.  Support for this amendment can be found in the specification at, for example, pages 21-24.  Applicants submit that Andersen does not teach or suggest any of the specific peptides recited in the present claims, much less that as a panel they would have enhanced sensitivity and be useful as a diagnostic method for tuberculosis.  Furthermore, Applicants submit that at the time of filing, a person of ordinary skill in the art would not have been able to predict that the specific peptide panel of the present invention would have high sensitivity.

Applicants submit that Andersen fails to disclose that the set of eight to eleven peptides derived from ESAT-6 would display such enhanced activity.  The peptide panel utilized in the present invention results in an assay with high sensitivity; the examples show that the presently claimed invention utilizing the recited peptide panels have a sensitivity of over 90%, compared to 69% for the tuberculin skin test (TST), a well established clinical diagnostic assay that employs PPD as the antigen.  See the specification at, for example, page 22.

***

Taken together, these features contribute to the high sensitivity of the presently claimed invention, and could not have been predicted at the time of filing.  The 'state of the art' clinical diagnostic test at the time of filing (*i.e.*, the TST) demonstrated much lower sensitivity than the present invention.

The state of the art was also such that one could not predictably use a peptide-based assay in patient populations representing diverse ethnic groups.  In contrast, the above-mentioned features of the present invention provide the advantage of allowing the same pool of peptides to function with high sensitivity in assays with samples from a broad genetic range of infected individuals.  See the specification at, for example, pages 21-22 and Table 2.  At the time of filing, it was not known whether T cell epitopes in ESAT-6 (and thus, "functionally equivalent" sequences, which only elicited responses in CD4+ T cells) would be recognized by the T cell populations of a broad range of infected individuals.  The present invention therefore provides a convenient method for diagnosing tuberculosis infection with a level of sensitivity greater in human population in general than could be predicted from the disclosure of Andersen.

Accordingly, Applicants submit that Andersen fails to teach or suggest the sequence limitations of the present invention and does not encompass the entire scope and contents of the present invention.  See *KSR Int'l. Co. v. Teleflex Inc.*, 127 S.Ct. 1727, 1740-41 (2007) (clarifying that an

In addition, as previously noted, assays of the present invention, which utilize the recited peptide pools, are unexpectedly capable of eliciting a response in **both** CD4+ and CD8+ T cells.  In contract, whole ESAT-6, disclosed in Andersen, only elicits a response in CD4+ T cells and not CD8+ T cells.  See the specification at, for example, pages 24-25.  This work was confirmed

**Sept. 2007 Applicant Remarks,
Defendants' Ex. B at 8-10 (Dkt No. 155-5)**

PMDX-30

# When Discussing Brandt, Oxford Did Not Disclaim Longer Peptides

Plaintiff represented in the specification that Brandt's peptides would not work in humans. (1:57-67 (explaining that the Brandt peptides were "*not found to be recognized in humans by the present inventors.*" (emphasis added).) Yet, Plaintiff now contends these non-

**Defendants Reply at 5 (Dkt No. 162)**

Brandt et al. (1996), Journal of Immunology, 157, 3527-33 discloses epitopes from ESAT-6 which are recognised by mice. However it is not possible to predict based on the epitopes which are recognised in mice which epitopes will be recognised in humans. As well as other differences in epitope processing, presentation and recognition mice have different MHC molecules from humans, and thus are expected to recognise different epitopes from humans. This is demonstrated by the fact that Brandt et al find the recognition of epitopes in mice which are not found to be recognised in humans by the present inventors.

**'646 Patent at 1:57-67**

# Brandt:  Distinguished Based on Peptide Activity, Not Length

In acknowledging inventive step in the relevant IPER and unity of invention, the Examiner for IPE of the Parent International application highlighted that D2 is confined to studies with mice.  Although the authors of D2 did find that peptide ES1 contains a T cell epitope recognized by T cells taken from *M. tuberculosis*-infected mice, it is not possible to extrapolate with reasonable expectation of success from that information that the same peptide will prove effective in detecting human TB patients.  The Examiner might be usefully referred to the discussion of D2 on page 2 of the description in the paragraph beginning at line 3.  As emphasized in that paragraph, "as well as other differences in epitope processing, presentation and recognition, mice have different MHC molecules from humans and thus are expected to recognize different epitopes from humans".  As illustration of this point, the information in Table 1 of D2 for peptide p6-20 is worthy of note.  That peptide was not identified as an epitope-containing fragment of the ESAT-6 protein by the mice studies of Brandt et al. However, it is identical to the peptide designated ES2 in the subject application (corresponding to SEQ ID No 6), which was found by the inventors to detect 40% of TB patients amongst the TB population tested (see table 1 on page 26).  Since the data for peptide ES2 in D2 does not reliably predict efficacy of the same peptide in diagnosing human  *M. tuberculosis* infection, the same must apply to the data presented in D2 for peptide ES1.

***

It is notable that D2 makes no reference to diagnosis whatsoever.  The results presented in table 1 of D2 where obtained using spleenic or lymph node cells rather than blood-derived T cells.  Furthermore, while the authors of D2 used the ELISPOT technique (the same technique as employed by the inventors in this instance), there is no suggestion in D2 to apply that technique for diagnosis in humans with specific ESAT-6 peptides as distinct from merely establishing that ESAT-6 does provide T cells epitopes in mice.  D2 only speculates about future vaccines with reference to whole ESAT-6 as a prominent target molecule.

**May 2003 Response to Restriction Requirement, Defendants' Ex. D at 6 (Dkt No. 155-7)**

# Brandt:  Distinguished Based on Peptide <u>Activity</u>, Not Length

*Third*, whereas the N-terminal ESAT-6 peptide studied in Brandt was stimulatory in only 2 of 6 mouse strains tested, the inventors found that a peptide represented by SEQ ID NO:1 was reactive and effective for *in vitro* tuberculosis diagnosis in a far higher proportion, thus unexpectedly rendering it highly useful as a diagnostic reagent. *Id.* at 1:58-59 ("the peptide represented by SEQ ID NO: 1 is recognised by 57% of patients tested and 68% of healthy contacts tested."); *id.* at 13:29-30 ("An unusually high proportion of patients responded to ES1.").

Significantly, the European Patent Office made a similar finding, and agreed that this was a surprising and unexpected result, as stated in an International Preliminary Examination Report ("IPER") submitted to the PTO during prosecution:

The present application is based on the **surprising finding** that the peptide 'ES1' represented by SEQ ID NO: 1 and corresponding to amino acids 1-15 of the ESAT-6 protein of Mycobacterium tuberculosis is suitable to detect nearly 60% of human TB patients. **This finding could not be expected from any of the relevant prior art** documents D1, D2 [Brandt], D3 and D7.

Ex. 2025 at ¶ 4 (emphasis added).

**Oxford's IPR Preliminary Response, Defendants Ex. X at 23, 67 (Dkt No. 162-2)**

# Defendants Fail to Meet Their Burden of Demonstrating a "Clear and Unmistakable" Disclaimer

*MIT v. Shire Pharm.*, 839 F.3d 1111, 1119 (Fed. Cir. 2016)

- "The party seeking to invoke prosecution history disclaimer **bears the burden** of proving the existence of a '**clear and unmistakable**' disclaimer"

# Peptide(s) "Represented By" the Recited SEQ ID NO(s)

| Term | Oxford's Proposal | Defendant's Proposal |
|---|---|---|
| Peptide(s) <u>represented by</u> SEQ ID NO(s) [X]<br><br>('646 and '898 patents only) | Peptides <u>comprising</u> the recited SEQ ID NO(s) | Peptides having the **exact sequence** set forth in SEQ ID NO(s): [X] and that is/are **15 amino acids in length** |

# Terms in Dispute

1.  Peptide(s) "Represented By" the Recited SEQ ID NO(s)

**2.  Peptide Panel "Comprising One or More Epitopes Contained Within" the Recited SEQ ID NO(s)**

3.  Peptide "Panel"; Panel of "Eight" Peptides

4.  "Determining" and/or "Detecting" steps

5.  Indefiniteness

    -   "one or more epitopes contained within"

    -   "peptide subfragment of ESAT-6 that contains a CD8+ epitope"

    -   "an immunogenic amount"

6.  "T Cell" Limitations

7.  Preambles

# Peptide panel comprising one or more epitopes contained within peptide SEQ ID NO: [X]

| Term | Oxford's Proposal | Defendant's Proposal |
|---|---|---|
| Peptide panel comprising one or more epitopes contained within peptide SEQ ID NO: [X]<br><br>('795, '211, and '902 patents) | Plain and ordinary meaning; no construction necessary | Peptide having the **exact sequence** set forth in SEQ ID NO(s): [X] that is **15 amino acids in length** |

**Issue:**  Are the claimed peptides limited to peptides having the **exact 15 amino acid sequence of the recited SEQ ID NO(s)?**

1. A method of in vitro diagnosis which distinguishes between (a) exposure of a human host to *Mycobacterium tuberculosis* and (b) vaccination of the human host with BCG, comprising determining whether T cells isolated from said host show a recognition response to a peptide panel comprising one or more epitopes contained within peptide SEQ ID NO: 1, wherein the presence of T cells that show said recognition response indicates that the host has been exposed to *Mycobacterium tuberculosis*, and wherein T cells from a host vaccinated with BCG but not exposed to *Mycobacterium tuberculosis* lack the recognition response.

'795 Patent, Claim 1

# The Claims Are Not Directed to the SEQ ID NO(s) Alone

**CLAIM LANGUAGE:**

- The claims are directed to a peptide panel **"==comprising== one or more epitopes contained within"** the recited SEQ ID NOs



Peptide panel "comprising one or more epitopes contained within peptide SEQ ID"

Epitopes ("X", "Y") contained within peptide SEQ ID

# The Specification Describes Peptides Longer Than 15 Amino Acids

## Length

The analogue is typically from ==8 to 80 amino acids in length,== such as 10 to 60 or 12 to 50, ==preferably 15 to 30 or 20 to 25.== Typically the amino acids in the analogue at the equivalent positions to amino acids in the original peptide which contribute to binding the MHC molecule or are responsible for the recognition by the T cell receptor, are the same or are conserved.

*See, e.g.,* '646 Patent at 7:27-34

## Homology

The analogue is typically a peptide. It may have homology with the equivalent original peptide represented by one of SEQ ID NO:1, 2, 3, 4, 5, 6, 7, 8, 9, 10 or 11. A peptide which is homologous to another peptide is ==typically at least 70% homologous to the peptide, preferably at least 80 or 90% and more preferably at least 95%, 97% or 99% homologous==

*See, e.g.,* '646 patent at 6:61-66

**ANALOGUE: e.g. 30 amino acids in length**



**PEPTIDES: 90% sequence homology with analogue**

<u>>15 amino acids</u>



27 amino acids (3 deletions)



30 amino acids (3 substitutions)

# Specification: The "ES" Peptides Are Merely Exemplary, Non-limiting Embodiments



The sequences of SEQ ID NOs 1 to 11 are shown be

| SEQ ID NO 1: | MTEQQWNFAGIEAAA (ES1) |
| SEQ ID NO 2: | SAIQGNVTSIHSLLD (ES4) |
| SEQ ID NO 3: | QKWDATATELNNALQ (ES12) |
| SEQ ID NO 4: | NNALQNLARTISEAG (ES14) |
| SEQ ID NO 5: | NLARTISEAGQAMAS (ES15) |
| SEQ ID NO 6: | WNFAGIEAAASAIQG (ES2) |
| SEQ ID NO 7: | EGKQSLTKLAAAWGG (ES7) |
| SEQ ID NO 8: | YQGVQQKWDATATEL (ES11) |
| SEQ ID NO 9: | NVTSIHSLLDEGKQS (ES5) |
| SEQ ID NO 10: | IEAAASAIQGNVTSI (ES3) |
| SEQ ID NO 11: | TATELNNALQNLART (ES513) |

**'646 Patent, 2:40-60**

"[P]ersons of ordinary skill in the art **rarely would confine** their definitions of terms to the **exact representations depicted in the embodiments.**"

*Phillips*, 415 F.3d at 1323

# "[P]rosecution disclaimer generally does not apply when the claim term in the descendant patent uses different claim language."

*Ventana Medical Sys., Inc. v. Biogenex Labs., Inc.,*
473 F.3d 1173, 1182 (Fed. Cir. 2006)

**1.** A method of diagnosing infection in a human host by, or exposure of a human host to, a mycobacterium that expresses ESAT-6, which method comprises the steps of:

(i) contacting a population of T cells from the host with a panel of eight peptides represented by SEQ ID NOS: 1 to 8, and

(ii) determining in vitro whether T cells of the T cell population show a recognition response to the panel by detecting IFN-γ secretion from the T cells.

'646 patent, claim 1
("represented by")

**1.** A method of in vitro diagnosis which distinguishes between (a) exposure of a human host to *Mycobacterium tuberculosis* and (b) vaccination of the human host with BCG, comprising determining whether T cells isolated from said host show a recognition response to a peptide panel comprising one or more epitopes contained within peptide SEQ ID NO: 1, wherein the presence of T cells that show said recognition response indicates that the host has been exposed to *Mycobacterium tuberculosis*, and wherein T cells from a host vaccinated with BCG but not exposed to *Mycobacterium tuberculosis* lack the recognition response.

'795 Patent, Claim 1
("comprising one or more epitopes contained within")

# Peptide panel comprising one or more epitopes contained within peptide SEQ ID NO: [X]

| Term | Oxford's Proposal | Defendant's Proposal |
|---|---|---|
| Peptide panel comprising one or more epitopes contained within peptide SEQ ID NO: [X]<br><br>('795, '211, and '902 patents) | Plain and ordinary meaning; no construction necessary | Peptide having the **exact sequence** set forth in SEQ ID NO(s): [X] that is **15 amino acids in length** |

# Terms in Dispute

1.    Peptide(s) "Represented By" the Recited SEQ ID NO(s)

2.    Peptide Panel "Comprising One or More Epitopes Contained Within" the Recited SEQ ID NO(s)

**3.    Peptide "Panel"/ Panel of "Eight" Peptides**

4.    "Determining" and/or "Detecting" steps

5.    Indefiniteness

   -    "one or more epitopes contained within"

   -    "peptide subfragment of ESAT-6 that contains a CD8+ epitope"

   -    "an immunogenic amount"

6.   "T Cell" Limitations

7.   Preambles

# "Peptide Panel" / Panel of "Eight" Peptides

| Term | Oxford's Proposal | Defendant's Proposal |
|---|---|---|
| Peptide panel ('795, '211, and '902 patents) | One or more peptides | **Pool** of **[ESAT-6 SEQ ID]*** peptides |
| Panel of eight peptides ('646 patent only) | Eight peptides | **Pool** containing **exactly** eight **individual [ESAT-6 SEQ ID 1-8]*** peptides |

*** Defendants did not disclose this aspect of construction until opening brief**

**1**. A method of in vitro diagnosis of *Mycobacterium tuber-culosis* infection in a host, comprising
(a) keeping a population of T cells isolated from said host in contact with a peptide panel comprising one or more epitopes contained within peptide SEQ ID NO: 1, and
(b) detecting a recognition response by the T cells to the peptide panel.

**'211 Patent, Claim 1**

# Defendants' Newly Disclosed Claim Construction Position:
## "ESAT-6" Limitation Undisclosed Until Opening Markman Brief

| Defs. **March 15** proposal | Panel of eight peptides | 646:1, 7 | Pool containing exactly eight individual peptides |
|---|---|---|---|
| | peptide panel | 795:1, 2, 17, 18 <br> 211:1, 2, 17, 18 <br> 902:1, 19 | Pool of peptides |

| Defs. **April 3** proposal (after March 31 meet-and-confer) | 646:1, 7 | Panel of eight peptides | Eight peptides (does not require eight peptides having uniquely distinct sequences) | Pool containing exactly eight individual peptides |
|---|---|---|---|---|
| | 795:1, 2, 17, 18 <br> 211:1, 2, 17, 18 <br> 902:1, 19 | peptide panel | "one or more peptides" | Pool of peptides |

| Defs. **April 14** Opening Markman brief | PATENT: CLAIM | TERM | PLTF'S CONSTRUCTION | DEFS' CONSTRUCTION |
|---|---|---|---|---|
| | 646:1, 7 | Panel of eight peptides | Eight peptides (does not require eight peptides having uniquely distinct sequences) | Pool containing exactly eight individual ESAT-6 SEQ ID 1-8 peptides |
| | 795:1,2,17,18 <br> 211:1,2,17,18 <br> 902:1,19 | peptide panel | "one or more peptides" | Pool of ESAT-6 SEQ ID peptides |

# The Claims Are Open-Ended "Comprising" Claims

**1.** A method of diagnosing infection in a human host by, or exposure of a human host to, a mycobacterium that expresses ESAT-6, which method comprises the steps of:
(i) contacting a population of T cells from the host with a panel of eight peptides represented by SEQ ID NOS: 1 to 8, and
(ii) determining in vitro whether T cells of the T cell population show a recognition response to the panel by detecting IFN-γ secretion from the T cells.

**'646 Patent, Claim 1**

**1.** A method of in vitro diagnosis which distinguishes between (a) exposure of a human host to *Mycobacterium tuberculosis* and (b) vaccination of the human host with BCG, comprising determining whether T cells isolated from said host show a recognition response to a peptide panel comprising one or more epitopes contained within peptide SEQ ID NO: 1, wherein the presence of T cells that show said recognition response indicates that the host has been exposed to *Mycobacterium tuberculosis*, and wherein T cells from a host vaccinated with BCG but not exposed to *Mycobacterium tuberculosis* lack the recognition response.

**'795 Patent, Claim 1**

**1.** A method of in vitro diagnosis of Mycobacterium tuberculosis infection in a host, comprising
(a) keeping a population of T cells isolated from said host in contact with a peptide panel comprising one or more epitopes contained within one or more peptides selected from the group consisting of: SEQ ID NO: 1, peptide SEQ ID NO: 2, peptide SEQ ID NO: 3, peptide SEQ ID NO: 4, peptide SEQ ID NO: 5, peptide SEQ ID NO: 6, peptide SEQ ID NO: 7, and peptide SEQ ID NO: 8, and
(b) detecting a recognition response by the T cells to the peptide panel.
**2.** The method of claim **1**, wherein the peptide panel further comprises one or more epitopes contained within one or more peptides selected from the group consisting of: peptide SEQ ID NO: 9, peptide SEQ ID NO: 10 and peptide SEQ ID NO: 11.

**'902 Patent, Claim 1**

**1.** A method of in vitro diagnosis of *Mycobacterium tuberculosis* infection in a host, comprising
(a) keeping a population of T cells isolated from said host in contact with a peptide panel comprising one or more epitopes contained within peptide SEQ ID NO: 1, and
(b) detecting a recognition response by the T cells to the peptide panel.

**'211 Patent, Claim 1**

# A "Peptide Panel" Is "One or More" Peptides

## SPECIFICATION:

- The specification describes a peptide panel as including "<u>one or more</u>" peptides



The invention provides a diagnostic product or panel comprising <mark>one or more of the peptides</mark> typically in the combinations discussed above. The product is typically a composition such as a pharmaceutical composition.

'646 Patent at 9:1-4

# "A Panel of Eight Peptides"
# One Component Can Satisfy Multiple Limitations

- *Linear Tech Corp. v. ITC*, 566 F.3d 1049, 1055 (Fed. Cir. 2009)

    - "We agree with the Commission's construction of 'second circuit' and 'third circuit,' defining the terms broadly to not require entirely separate and distinct circuits."

    - "Rather, the 'second' and 'third' circuits must only perform their stated <u>functions</u>."

# Defendants Misquote the '646 Patent

- What Defendants argued in their brief:

> tuberculosis" that ultimately served as the impetus for the patents. (1:39-42.) "The inventors combined these peptides into a panel of peptides" which corresponded collectively to 85% of the ESAT-6 sequence. (1:46.) "[W]hen used together in a diagnostic test, this ESAT-6 panel provide a specificity of 91.5% and a sensitivity of 96%." (1:47-48).[5]

**Defendants' Opening Brief at 4**

- What Oxford's '646 patent actually says:

> These contacts have been exposed to open pulmonary tuber-culosis. The inventors have combined these peptides into a panel of peptides which when used together in a diagnostic test provide a specifity of 91.5%, and a sensitivity of 96%. The

**'646 patent at 1:46-48**

PMDX-49

# "Peptide Panel"; Panel of "Eight" Peptides

| Term | Oxford's Proposal | Defendant's Proposal |
|---|---|---|
| Peptide panel ('795, '211, and '902 patents) | One or more peptides | **Pool** of **[ESAT-6 SEQ ID]*** peptides |
| Panel of eight peptides ('646 patent only) | Eight peptides | **Pool** containing **exactly** eight **individual [ESAT-6 SEQ ID 1-8]*** peptides |

*\* Defendants did not disclose this aspect of construction until opening brief*

# Terms in Dispute

1. Peptide(s) "Represented By" the Recited SEQ ID NO(s)

2. Peptide Panel "Comprising One or More Epitopes Contained Within" the Recited SEQ ID NO(s)

3. Peptide "Panel"; Panel of "Eight" Peptides

4. **"Determining" and/or "Detecting" steps**

5. Indefiniteness

   - "one or more epitopes contained within"

   - "peptide subfragment of ESAT-6 that contains a CD8+ epitope"

   - "an immunogenic amount"

6. "T Cell" Limitations

7. Preambles

# "Determining" or "Detecting" Whether the T Cells Show a Recognition Response to the Peptides

| Term | Oxford's Proposal | Defendant's Proposal |
|---|---|---|
| determining [in vitro] whether [the T cells] show a recognition response to [the recited peptide(s)/ panel]<br><br>('646 , '898 and '795 patents) | Determining whether the T cells respond to the [peptide(s)/panel] | **Noting a presence or absence of** a recognition response, in vitro, of [the T cells] **attributable to** [the recited peptide(s)/ panel] |
| detecting a recognition response by the T cells to the peptide panel<br><br>('211 and '902 patents) | Detecting whether the T cells respond to the [peptide(s)/panel] | **Noting a presence or absence of** a recognition response of the T cells **attributable to** [peptide SEQ ID NO(s): X] |

# "Detecting IFN-γ Secretion";
# "To Detect a Recognition"

| Term | Oxford's Proposal | Defendant's Proposal |
|---|---|---|
| <u>detecting</u> IFN-γ [secretion from/production by] the T cells<br><br>('646 and '795 patents) | Plain and ordinary meaning; no construction necessary | **Noting** IFN-γ [secretion from/production by] the T cells **attributable to** the [recited peptide(s)/panel] |

# "Determining" Whether Said T Cells Are Activated

| Term | Oxford's Proposal | Defendant's Proposal |
|------|-------------------|----------------------|
| <u>Determining</u> whether said T cells are activated by said peptide subfragment by measuring secretion of a cytokine from said T cells<br><br>('821 patent, claims 1 and 6) | Determining whether the T cells respond to the peptide subfragment [by measuring secretion of a cytokine from said T cells] | **Noting the presence or absence** of activation of said T cells **attributable** to the claimed peptide by measuring secretion of a cytokine from said T cells |
| The activation of said T cells is <u>determined</u> by measuring secretion of interferon-γ from said T cells<br><br>('821 patent, claim 3) | Determining whether the T cells respond to the peptide subfragment [by measuring secretion of interferon-γ from said T cells] | The **presence or absence** of activation of the T cells **attributable** to the claimed peptide is noted by calculating secretion of interferon-γ from the T cells |

# Claim Language

> **1**. A method of diagnosing infection in a human host by, or exposure of a human host to, a mycobacterium which expresses ESAT-6, which method comprises the steps of:
>   (i) contacting a population of T cells from the host with the peptide represented by SEQ ID NO: 1; and
>   (ii) determining in vitro whether the T cells of said T cell population show a recognition response to said peptide.

**'898 patent, claim 1;** *see also* **'646 patent**

# Qiagen's Position

If the claimed diagnostic test does not require detection of a response *attributable to the recited ESAT-6 peptide/panel*, but instead covers detection of a response by the T cells to larger panels with peptides derived from different sources, the alleged inventive step relied upon to secure allowance would be abrogated. *See Spectrum Intern., Inc.*, 164 F.3d at 1378 ("That explicit arguments made during prosecution to overcome prior art can lead to narrow claim interpretations makes sense, because the public has a right to rely on such definitive statements made during prosecution.") (internal quotations omitted).

**Defendants' Opening Brief at 16 (Dkt No. 155)**

PMDX-56

# Qiagen's Supporting "Evidence" Offers No Support

In prosecution, Patentee repeatedly emphasized that the crucial and unexpected features of the claimed invention—improved accuracy and reliability—resulted from the T cell response to the *specific claimed ESAT-6 peptides.* (*See, e.g.,* Sadasivan Decl., Ex. B at p. 8 (Also, "at the time of filing, a person of ordinary skill in the art would not have been able to predict *that the specific peptide panel of the present invention* would have high sensitivity."); *id.* at 9 (The "peptide panel utilized in the present invention *results in an assay with high sensitivity*; the examples show that the presently claimed invention utilizing *the recited peptide panels* have a sensitivity of over 90%, compared to 69% for the tuberculin skin test (TST), a well-established clinical diagnostic assay that employs PPD as the antigen."); Ex. C at pp. 5-6 ("[W]e submit that the *essential inventive step* in this case consists of the identification of important ESAT-6 T cell epitopes in the context of this combined clinical and immunological setting, *and the surprising showing that a panel comprising a small, convenient number of these ESAT-6 peptides* does in fact provide the basis for a 'universal' test for TB *which outperforms existing tests in terms of accuracy.*") (emphasis added in all).)

**Defendants' Opening Brief at 15-16**

PMDX-57

# Defendants Misquote the '821 Specification

- What Defendants argued in their brief:

> *invention,* the technique has been used to develop an assay for peptide-specific T-cells that have
> been pre-sensitised in vivo *to a particular peptide.*"); 2:30-36 ("The method of the *invention*
> involves adding a peptide" to the cells, and then the "resulting fluid mixture is incubated under
> conditions to stimulate any peptide-specific T-cells that may have been pre-sensitised *to that*
> *particular [] peptide* in vivo.") (emphasis added).)

**Defendants' Opening Brief at 21**

- What Oxford's '821 patent actually says:

> The method of the invention involves adding a peptide to
> the fluid. The peptide may be a known epitope for a well
> characterised viral infection; or may be a candidate epitope
> possibly associated with a less well characterised viral infec-
> tion. The resulting fluid mixture is incubated under conditions
> to stimulate any peptide-specific T-cells that may have been
> pre-sensitised to that particular virus-derived peptide in vivo.

**'821 patent, 2:30-36**

# Wherein Activation of Said T Cells "Identifies" the Presence of *Mycobacterium tuberculosis*-specific Immediate Effector T Cells

| Term | Oxford's Proposal | Defendant's Proposal |
|---|---|---|
| Wherein clause of claims 1 and 6 ("identifies"):<br><br>Wherein activation of said T cells identifies the presence of *Mycobacterium tuberculosis*-specific immediate effector T cells [that were present in the original sample] in said subject<br><br>('821 patent) | Plain and ordinary meaning; no construction necessary | Wherein the presence of activation of said T cells **attributable to** the claimed peptide **establishes** that *Mycobacterium tuberculosis*- specific immediate effector T cells were present [in the original sample] in said subject |

# Wherein Activation of Said T Cells "Identifies" the Presence of *Mycobacterium tuberculosis*-specific Immediate Effector T Cells

- "Identifies" is an ordinary word requiring no construction

- Defendants' construction replaces "identifies" with "establishes"
  - To "establish" means to "**prove** the validity or truth of" or "put **beyond doubt**"  (Oxford Brief at 12, Dkt No. 153)

- However, the '821 patent teaches that results are merely <u>indicative</u> or <u>likely</u>:



ised the ES12 peptide. This patient also has HLA-B52 and -A2.01 and the magnitude of the ES12-specific response was similar to the response to the HLA-A2-restricted influenza matrix epitope. Single cell IFN-γ release by freshly isolated T cells in these short 12 hr ex vivo assays, employing no stimulus other than cognate peptide, indicates that these cells are highly likely to be circulating activated effector T cells.

'821 Patent at 8:29-35

# "Determining" or "Detecting" Whether the T Cells Show a Recognition Response to the Peptides

| Term | Oxford's Proposal | Defendant's Proposal |
|---|---|---|
| determining [in vitro] whether [the T cells] show a recognition response to [the recited peptide(s)/ panel]<br><br>('646, '898, and '795 patents) | Determining whether the T cells respond to the [peptide(s)/panel] | **Noting a presence or absence of** a recognition response, in vitro, of [the T cells] **attributable to** [the recited peptide(s)/ panel] |
| detecting a recognition response by the T cells to the peptide panel<br><br>('211 and '902 patents) | Detecting whether the T cells respond to the [peptide(s)/panel] | **Noting a presence or absence of** a recognition response of the T cells **attributable to** [peptide SEQ ID NO(s): X] |

# Terms in Dispute

1.  Peptide(s) "Represented By" the Recited SEQ ID NO(s)

2.  Peptide Panel "Comprising One or More Epitopes Contained Within" the Recited SEQ ID NO(s)

3.  Peptide "Panel"; Panel of "Eight" Peptides

4.  "Determining" and/or "Detecting" steps

**5.  Indefiniteness**

-   **"one or more epitopes contained within"**

-   **"peptide subfragment of ESAT-6 that contains a CD8+ epitope"**

-   **"an immunogenic amount"**

6.  "T Cell" Limitations

7.  Preambles

# "Indefiniteness" Disputes

| Term | Oxford's Proposal | Defendant's Proposal |
|---|---|---|
| One or more epitopes contained within<br><br>('795, '211, and '902 patents) | Plain and ordinary meaning;<br>No construction necessary | Indefinite |
| Peptide subfragment of ESAT-6 that contains a CD8+ epitope<br><br>('821 patent) | Plain and ordinary meaning;<br>No construction necessary | Indefinite |
| an immunogenic amount<br><br>('821 patent) | Plain and ordinary meaning;<br>No construction necessary | Indefinite |

# "One or more epitopes contained within";
# "an immunogenic amount";
# "Peptide subfragment of ESAT-6 that contains a CD8+ epitope"

1. A method of in vitro diagnosis which distinguishes between (a) exposure of a human host to *Mycobacterium tuberculosis* and (b) vaccination of the human host with BCG, comprising determining whether T cells isolated from said host show a recognition response to a peptide panel comprising one or more epitopes contained within peptide SEQ ID NO: 1, wherein the presence of T cells that show said recognition response indicates that the host has been exposed to *Mycobacterium tuberculosis*, and wherein T cells from a host vaccinated with BCG but not exposed to *Mycobacterium tuberculosis* lack the recognition response.

**'795 Patent, Claim 1**

1. An assay for identifying *Mycobacterium tuberculosis*-specific immediate effector T cells in a subject, comprising:
   (a) providing a sample from said subject containing T cells;
   (b) exposing said T cells to an immunogenic amount of a peptide subfragment of ESAT-6 that contains a CD8+ epitope; and
   (c) prior to the generation of new immediate effector T cells in the sample, determining whether said T cells are activated by said peptide subfragment by measuring secretion of a cytokine from said T cells;
wherein activation of said T cells identifies the presence of *Mycobacterium tuberculosis*-specific immediate effector T cells that were present in the original sample, in said subject.

**'821 Patent, Claim 1**

# Indefiniteness:  Legal Standard

- "Indefiniteness must be proven by **clear and convincing evidence**." *Sonix Tech. Co. v. Publ'ns Int'l Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017)

- Intrinsic record must "inform those skilled in the art about the scope of the invention with **reasonable certainty**."  *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014)

- **"[A]bsolute precision is unattainable"** and thus "the certainty which the law requires in patents is not greater than is reasonable, [with] regard to their subject matter."  *Mins. Separation Ltd. v. Hyde*, 242 U.S. 261, 270 (1916)

- **"[C]lose questions** of indefiniteness in litigation involving issued patents are **resolved in favor of the patentee**."  *Exxon Res. & Eng'g Co. v. U.S.*, 265 F.3d 1371, 1380 (Fed. Cir. 2001)

# Overview of General Defects in Defendants' "Indefiniteness" Challenges

1.  **IPR Petitions:**  Qiagen submitted 5 separate IPR petitions in which its attorneys and expert understood and applied each and every claim limitation to the asserted prior art references

2.  **Attorney Argument:** Defendants rely solely on attorney argument, which is not "clear and convincing evidence"

# IPR Petitions: Qiagen Fully Understood the Meaning of the Claims When Filing Its IPRs

## VI. CLAIM CONSTRUCTION

In an *inter partes* review, claim terms in an unexpired patent are accorded their broadest reasonable construction in light of the patent specification in which they appear. 37 C.F.R. §42.100(b); *see Cuozzo Speed Techs., LLC v. Lee*, No. 15–446, 2016 WL 3369425, at *12 (U.S. June 20, 2016). Claim terms are given their ordinary and customary meaning, as would be understood by one of ordinary skill in the art in the context of the entire disclosure. *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007).

**Qiagen '821 patent IPR Petition: Oxford Ex. W at 13-14 (Dkt No. 154-23)**

# Attorney Argument Is Not Evidence

- Defendants' "indefiniteness" challenge rests solely on legally insufficient **attorney argument**, which is not evidence, let alone "clear and convincing" evidence

16      *See, e.g., Mallinckrodt, Inc. v. Masimo Corp.*, 147 Fed. App'x 158, 179 (Fed. Cir. 2005) (rejecting indefiniteness challenge where infringer "base[d] its indefiniteness challenge entirely on attorney argument"); *WesternGeco L.L.C. v. ION Geophysical Corp.*, 876 F. Supp. 2d 857, 875 (S.D. Tex. 2012)("Defendants' unsupported attorney argument fails to prove indefiniteness by clear and convincing evidence"); *Cacace v. Meyer Mktg.*, 812 F. Supp. 2d 547, 561 (S.D.N.Y. 2011)("mere attorney argument is insufficient to establish invalidity based on indefiniteness"); *Ossur HF v. iwalk, Inc.*, No. 12-11061, 2013 U.S. Dist. LEXIS 111933, **25-27 (D. Mass. Aug. 8, 2013)("attorney argument, without more, is generally not considered clear and convincing evidence sufficient to overcome the presumption of validity.").

**Oxford Reply Brief  at 12 n. 16 (Dkt No. 161)**

# Individual Variations Do Not Render Claims Indefinite

- Courts routinely uphold claims as definite notwithstanding variations across individual subjects

17      See, e.g., Warsaw Orthopedic, Inc. v. NuVasive, Inc., 778 F.3d 1365, 1371 (Fed. Cir. 2015) ("the relative nature of the claim does not itself make it indefinite, and NuVasive failed to establish, by clear and convincing evidence, that human anatomy varies so significantly" to "make[] the claims indefinite."); Young v. Lumenis, Inc., 492 F.3d 1336, 1346 (Fed. Cir. 2007)(holding claims definite even though "the size of the appendage and the amount of skin required to be incised will vary from animal to animal based on the animal's size"); In re Halleck, 422 F.2d 911, 914 (C.C.P.A. 1970) (finding claims definite even though the effective amount "may vary for a specific agent and specific animal at a particular stage of growth").

**Oxford Reply at 13 n. 17
(Dkt No. 161)**

# Individual Genetic Differences Were Already Before the PTO During Prosecution

> (b) identifying T cell epitopes that were specific for different HLA specificities which exist across the human population in an attempt to provide the necessary breadth of coverage of all predominant HLA specificities (as indicated above such necessary breadth of targeting of a peptide panel to facilitate a universal assay for use with T cells derived from a broad spectrum of patients was not predictable from the work of Andersen et al.)
>
> ***
>
> Accordingly, we contend that the inventors have gone well beyond the mere discovery of T cell epitopes in ESAT-6.  They have identified peptide sequences that are diagnostically the most relevant, taking account of the differences between individuals within the human population from both clinical and immunological standpoints.  Thus, we submit that the essential inventive step in this case consists

**Sept. 2003 Office Action Response**
**Defs. Ex. C at 5 (Dkt No. 155-6)**

• Defendants cannot credibly argue that Oxford's IPR responses "opened the door" and/or introduced new indefiniteness issues

# Routine Experimentation Is Permissible

- Claims are not indefinite when relevant information can be determined through routine experimentation:

  - *Exxon*, 265 F.3d at 1379 ("the fact that some experimentation may be necessary to determine the scope of the claims does not render the claims indefinite.")

  - *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1576 (Fed. Cir. 1986) (rejecting indefiniteness challenge because "one of ordinary skill in the art would easily have been able to determine the appropriate dimensions.")

# Epitope Determination Is a Routine Procedure: Disclosure Not Required

- **IPR Petitions**:  Qiagen and its expert repeatedly emphasized epitope determination was <u>routine</u>:

> Identification of the T cell epitopes is a routine method which uses an overlapping peptide strategy in which a series of peptides are chemically synthesized, and correspond to the full-length of the antigenic protein of interest wherein each of the peptides overlaps with its adjacent peptide(s) by, e.g., 5-10 amino acids. T cells isolated from a subject are then incubated or contacted with each peptide to determine which peptide(s) elicit a response such as a proliferative response or cytokine secretion (Ernst Decl. ¶46).

**Qiagen '211 IPR Petition Oxford Ex. U at 13 (Dkt No. 154-21)**

> 46.   Identification of the T cell epitopes is routinely done using an overlapping peptide strategy in which a series of peptides are synthesized

**Qiagen '211 IPR, Ernst Expert Decl. Oxford Ex. V at ¶46 (Dkt No. 154-22)**

# Epitope Determination Is a Routine Procedure: Disclosure Not Required

**'821 IPR Petition**:  Qiagen emphasized that CD8+ epitope identification was *routine*:

> Furthermore, it would have been obvious to use the Brandt-1996 peptides in the IFN-γ assay taught by Mukherjee-1995 even if CD8+ epitopes in ESAT-6 were unknown, in light of the inventor's own declaration that detecting CD8+ T-cells to novel epitopes was routine and well-known in 1996.  *KSR International Co. v.*
>
> ***
>
> that a POSA would have every reason to expect success given the routine nature of identifying CD8+ epitopes, as the Inventor admits.  *Inter partes* review of these
>
> ***
>
> for tuberculosis. The routine nature of identifying CD8+ epitopes and peptides containing the same and assess their ability to activate T-cells before the filing date of the '821 Patent (and even before the filing date of its priority document) is

**Qiagen '821 IPR petition, Ex. W at 48, 54, 67 (Dkt No. 154-23)**

# The Claims Recite Peptides that <u>Contain</u> T-Cell Epitope(s)

- Qiagen's IPR petitions did not identify the length or sequence of specific epitopes

- *A peptide <u>contains</u> T-cell epitope(s) if it produces a T-cell response:*

molecule to the T cell. <mark>If the T cells provide a response,</mark> such as by IFN-γ release or cytotoxic T cell assay ("CTL"), <mark>then the antigen that elicits such a response contains a T cell epitope.</mark>

**Qiagen '211 IPR, Ernst Expert Decl.**
**Oxford Ex. V at ¶ 27**
**(Dkt No. 154-22)**

Scanning

<mark>In principle, scanning for T cell epitopes is simple</mark> and only requires that appropriate linear peptides homologous with the whole antigen are added to the APC/T cell mixture, followed by the measurement of a parameter of T cell activation. The added peptides can associate with "empty" MHC molecules on the surface of APC, or may be taken up by endocytosis and associate with newly synthesized or recycled MHC molecules. In either case, a degree of peptide breakdown can occur, giving rise to recognition of a truncated version of the synthetic peptide added. Thus, <mark>a response to a peptide *in vitro* indicates that the epitope is contained within the sequence used,</mark> but does not of itself define the effective or minimal sequence.

<u>Scientific Literature</u>:
**Van Regenmortel 1996**
**Oxford Ex. X at 52**
**(Dkt No. 154-24)**

# The '821 Patent Explains "Immunogenic Amount"

It is preferred that the peptide be added in uncombined form to the fresh cells. While it is possible to add cultured cells that have been pulsed with the peptide, this is not necessary when using defined peptide epitopes. The peptides should be added in an amount sufficient to generate an observable signal; a preferred concentration range in the fluid is 0.01 up to 100 µM particularly 0.5-5.0 µM.

'821 Patent, 2:46-52

# The Amount of Oxford's Claimed Peptides Is Not Critical

- *In re Halleck*, 422 F.2d 911, 914 (C.C.P.A. 1970) ("'an **effective amount** for growth stimulation' is not objectionable where **the amount as such is not critical** and its use has been approved in many cases.")

- *In re Gardner*, 427 F.2d 786, 788 (C.C.P.A. 1970) ("'effective amount,' which, though broad, is not indefinite.  Where the invention resides in finding the **activity rather than in discovery of some critical range** or the like, we have approved of such broad definitions of quantity or dosage.")

- *Erfindergemeinschaft Uropep GbR v. Eli Lilly & Co.*, No. 15-cv-1201, 2016 U.S. Dist. LEXIS 172395, *16 (E.D. Tex. Aug. 11, 2016) (Bryson, J.) ("**The amount is plainly not critical to the invention** . . . The use of the term 'effective amount' therefore does not render the claims of the '124 patent fatally indefinite.").

# "Indefiniteness" Disputes

| Term | Oxford's Proposal | Defendant's Proposal |
|---|---|---|
| One or more epitopes contained within<br><br>('795, '211, and '902 patents) | Plain and ordinary meaning;<br>No construction necessary | Indefinite |
| Peptide subfragment of ESAT-6 that contains a CD8+ epitope<br><br>('821 patent) | Plain and ordinary meaning;<br>No construction necessary | Indefinite |
| an immunogenic amount<br><br>('821 patent) | Plain and ordinary meaning;<br>No construction necessary | Indefinite |

# Terms in Dispute

1. Peptide(s) "Represented By" the Recited SEQ ID NO(s)

2. Peptide Panel "Comprising One or More Epitopes Contained Within" the Recited SEQ ID NO(s)

3. Peptide "Panel"; Panel of "Eight" Peptides

4. "Determining" and/or "Detecting" steps

5. Indefiniteness

   - "one or more epitopes contained within"

   - "peptide subfragment of ESAT-6 that contains a CD8+ epitope"

   - "an immunogenic amount"

6. **"T Cell" Limitations**

7. Preambles

# The "T Cell" Limitations

| Term | Oxford's Proposal | Defendant's Proposal |
|---|---|---|
| population of T cells from the host<br><br>population of T cells isolated from said host<br><br>('646 patent family) | T cells that have been removed from a host | Population of T cells **in the form of peripheral blood mononuclear cells or mononuclear cells isolated from a sample** [taken] from the host |
| Providing a sample from said subject containing T cells<br><br>('821 patent) | Providing T cells that have been removed from the subject | Providing fluid that contains **isolated** T cells **in the form of peripheral blood mononuclear cells or mononuclear cells** from said subject |

**Issue:**  Whether the claims can be practiced using **whole blood** samples

# CLAIM LANGUAGE ('646 Patent Family):
# A population of T-cells from the <u>host</u>





Host

Blood sample
from <u>host</u>

PBMCs/MCs
isolated from the blood <u>sample</u>
[Defendants' construction]

# The '646 Patent Family: Specification Describes Using Unprocessed Whole Blood

- The T-cells are obtained from a **blood sample**, which can preferably be used **directly** in the assay **without any processing**:



Generally the T cells which are contacted in the method are taken from the host in a blood sample, although other types of samples which contain T cells can be used. The sample may be added directly to the assay or may be processed first. Typically the processing may comprise diluting of the sample, for example with water or buffer. Typically the sample is diluted from 1.5 to 100 fold, for example 2 to 50 or 5 to 10 fold.

***

be purified from the sample. PBMCs, MCs and T cells can be separated from the sample using techniques known in the art, such as those described in Lalvani et al (1997) *J.Exp. Med.* 186, p859-865. Preferably the T cells used in the assay are in the form of unprocessed or diluted samples, or are freshly isolated T cells (such as in the form of freshly isolated MCs or PBMCs)

The kit may additionally comprise medium for the T cells, detection agents or washing buffers to be used in the detection steps. The kit may additionally comprise reagents suitable for the separation from the sample, such as the separation of PBMCs or T cells from the sample. The kit may be designed to allow detection of the T cells directly in the sample without requiring any separation of the components of the sample.

'646 Patent, 4:34-41, 4:48-54, 8:41-47

# The '646 Patent Family: Isolating PBMCs and MCs from the Blood Sample is <u>Optional</u>, Not Required

- Further isolating PBMCs and MCs from a sample is an <u>optional</u> embodiment ("may"; "can")– it is *not* mandatory or required:



Generally the T cells which are contacted in the method are taken from the host in a blood sample, although other types of samples which contain T cells can be used. The sample may be added directly to the assay or may be processed first.

\*\*\*

The processing may comprise separation of components of the sample. Typically mononuclear cells (MCs) are separated from the samples. The MCs will comprise the T cells and APCs. Thus in the method the APCs present in the separated MCs can present the peptide to the T cells. In another embodiment only T cells, such as only CD4 or only CD8 T cells, can be purified from the sample. PBMCs, MCs and T cells can be separated from the sample using techniques known in the art, such as those described in Lalvani et al (1997) *J.Exp. Med.* 186, p859-865.

The kit may additionally comprise medium for the T cells, detection agents or washing buffers to be used in the detection steps. The kit may additionally comprise reagents suitable for the separation from the sample, such as the separation of PBMCs or T cells from the sample. The kit may be designed to allow detection of the T cells directly in the sample without requiring any separation of the components of the sample.

'646 Patent,
4:34-37,
4:42-51,
8:41-47

# '821 Patent Claim Language

**"a sample from said subject <u>containing</u> T-cells"**

- *See Mars, Inc. v. H.J. Heinz Co.*, 377 F.3d 1369, 1376 (Fed. Cir. 2004) ("[L]ike the term 'comprising,' the terms 'containing' and 'mixture' are open-ended")

# The '821 Patent:
# Specification Mentions Other Detection Methods

- Inventors made clear that the claims can be practiced using a variety of known methods, not just ELISPOT:

> the cells secrete various cytokines, of which any one may be selected for the purposes of this assay. Preferably the cytokine selected is interferon-γ (IFN γ). The secreted cytokine can be detected by any of a variety of methods known in the literature. Preferably the assay method involves providing a surface carrying an immobilised first antibody to the IFN-γ or other cytokine. A fluid containing the

'821 patent at 2:17-24

- *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1370 (Fed. Cir. 2008)(rejecting narrow claim construction where "sparse but broad" language stated that invention could be practiced using "**any other method comprised in the state of the art**")

# The "T Cell" Limitations

| Term | Oxford's Proposal | Defendant's Proposal |
|---|---|---|
| population of T cells from the host<br><br>population of T cells isolated from said host<br><br>('646 patent family) | T cells that have been removed from a host | Population of T cells **in the form of peripheral blood mononuclear cells or mononuclear cells isolated from a sample** [taken] from the host |
| Providing a sample from said subject containing T cells<br><br>('821 patent) | Providing T cells that have been removed from the subject | Providing fluid that contains **isolated** T cells **in the form of peripheral blood mononuclear cells or mononuclear cells** from said subject |

# Terms in Dispute

1.   Peptide(s) "Represented By" the Recited SEQ ID NO(s)

2.   Peptide Panel "Comprising One or More Epitopes Contained Within" the Recited SEQ ID NO(s)

3.   Peptide "Panel"; Panel of "Eight" Peptides

4.   "Determining" and/or "Detecting" steps

5.   Indefiniteness

   -   "one or more epitopes contained within"

   -   "peptide subfragment of ESAT-6 that contains a CD8+ epitope"

   -   "an immunogenic amount"

6.   "T Cell" Limitations

7.   **Preambles**

# Preambles:
# '646 Patent Family ("Diagnosing" & "Diagnosis")

| Term | Oxford's Proposal | Defendant's Proposal |
|---|---|---|
| [The preambles of the '646 patent family] | Preamble limits claims to "diagnosing" and "diagnosis," which should be given their plain and ordinary meaning | Preambles are limiting |

**1.** A method of ==diagnosing== infection in a human host by, or exposure of a human host to, a mycobacterium that expresses ESAT-6, which method comprises the steps of:

(i) contacting a population of T cells from the host with a panel of eight peptides represented by SEQ ID NOS: 1 to 8, and

(ii) determining in vitro whether T cells of the T cell population show a recognition response to the panel by detecting IFN-γ secretion from the T cells.

**'646 Patent, Claim 1**

# Defendants Misstate Oxford's Position

| REPRESENTATIVE PATENT: CLAIM[7] | TERM | PLTF'S CONSTRUCTION | DEFS' CONSTRUCTION |
|---|---|---|---|
| 211:1,17 | A method of in vitro diagnosis of *Mycobacterium tuberculosis* infection in a host | Not limiting | Preamble is limiting; A method of in vitro diagnosis of *Mycobacterium tuberculosis* infection in a human or animal |

Defs. Opening Brief at 7 (Dkt No. 155)

From: Sirles, Gourdin W.
Sent: Wednesday, April 05, 2017 7:54 PM
To: Sadasivan, Bhanu; Chen, Thomas C.
Cc: Qiagen-Oxford MWE Team; lfurnald@robinskaplin.com; emcmahon@robinskaplin.com; jmcampbell@campbell-trial-lawyers.com; chowe@campbell-trial-lawyers.com; PR_Oxford; Boetticher, Evan
Subject: RE: Oxford v. Qiagen, et al - 15-cv-13124-NMG

\*\*\*

We also note that Defendants have modified their constructions for the preambles and certain other claim terms. Regarding the preambles, Defendants' updated construction does not add any clarity to their previous position that the preambles are merely "limiting." Defendants' position is still unclear, given the apparent differences between how the Defendants address the preambles in their non-infringement and invalidity contentions. From Defendants' non-infringement contentions, however, it appears that the sole dispute centers on Defendants' position regarding the terms diagnosis (for five patents) and identifying (for the '821 patent).

As such, in order to simplify the issues for the benefit of the Court, Oxford will agree that the preambles of the five related patents limit the claims to kits/ methods for "diagnosis/diagnosing," and that the preamble of the '821 patent limits the claims to methods for "identifying." Oxford will thus address Defendants' apparent position on those terms. If there are other disputes that you believe are raised in the preambles, please advise.

**Oxford's April 5 Email to Defs. Counsel; Oxford Reply Ex. 1 (Dkt No. 161-2)**

# '821 Preambles:  Defendants' Waiver

- Oxford's opening brief plainly addressed the meaning of "identifying" in the '821 preambles:

| Claim Term | Defendants' Proposal | Oxford's Proposal |
|---|---|---|
| Preamble:  An assay for <u>identifying</u> *Mycobacterium tuberculosis*-specific immediate effector T cells in a subject | Preamble is limiting<br><br>(Defendants' constructions largely reproduce the language from the preambles, without further explanation) | Preamble limits claims to methods of "identifying" *M. tuberculosis*-specific immediate effector T cells;<br><br>(plain and ordinary meaning of "identifying" applies) |

As with the '646 patent family (Section IV.A.9), Defendants claim the '821 preambles are "limiting," but refuse to clarify whether they are seeking the restrictive reading set forth in their non-infringement contentions, or the broader reading in their invalidity contentions.  In any event, the '821 specification teaches that the claimed assays are *indicative* of the likelihood of prior infection; not definitive.  *See* Ex. F, '821 patent at 8:32-35 (interferon-γ release by T cells "indicates that these cells are highly *likely* to be circulating activated effector T cells"); Section IV.A.5.[38]  The Court should adopt the plain and ordinary meaning of "identifying," and reject Defendants' unrealistic non-infringement construction requiring the claimed assays to provide definitive results, entirely free of false positives and/or false negatives.

**Oxford Opening Brief at 21-22 (Dkt No. 153)**

# '821 Preamble:  Defendants' Waiver

- Defendants chose not to respond to or dispute Oxford's position regarding the plain meaning of "identifying"

[2] This brief addresses the disputed terms across Plaintiff's 61 asserted claims.  The number of terms in dispute may change after Plaintiff reduces the asserted claims to 25 in view of the Court's 4/26/2017 Order.   ECF No. 153.   Also, Plaintiff addresses additional terms in its Opening Brief not discussed here; Defendants streamlined the claim construction process to the terms identified in their brief.  ECF No. 155.  ==The Court therefore need not construe the terms identified in Plaintiff's Brief at Section IV.A.2, IV.A.5, IV.B.3, IV.B.4 (except the activation therm), IV.C.3,== most of which Plaintiff simply contended should be "plain and ordinary" meaning.  ECF No. 153 at 8, 11, 20 and 21.

**Defendants' Reply at 2 n.2 (Dkt No. 162)**

# Preambles:
# '646 Patent Family ("Diagnosing" & "Diagnosis")

| Term | Oxford's Proposal | Defendant's Proposal |
|------|-------------------|----------------------|
| [The preambles of the '646 patent family] | Preamble limits claims to "diagnosing" and "diagnosis," which should be given their plain and ordinary meaning | Preambles are limiting |

 **v.** Qiagen Inc., *et. al*

# Oxford's Claim Construction Presentation
### June 8, 2017

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on June 8, 2017, I caused a true and correct copy of the foregoing document to be filed through the CM/ECF system which will send electronic copies to all counsel of record.


*/s/ Gourdin W. Sirles*
Gourdin W. Sirles